**Frederick Willard THOMPSON, Petitioner-Appellant,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.**

**No. 14054.**

United States Court of Appeals Seventh Circuit.

May 21, 1964.

Marshall Patner, Chicago, Ill., for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

DUFFY, Circuit Judge.

This appeal is from an order of the District Court denying appellant's petition for naturalization. Appellant's petition was heard *de novo* in open court as provided by Title 8 U.S.C. § 1447. This case is here for the second time.

The petition for naturalization herein was filed in 1946. Nearly fifteen years later, the Naturalization Examiner recommended against granting the petition. After a *de novo* hearing, the District Court, on April 18, 1962, entered an order denying the petition for naturalization. Twelve days later, appellant served a notice that he would appear before the trial judge and present a motion. This motion turned out to be a motion to amend certain Findings of Fact, to strike certain Findings and for a new trial. Appellant's motion was not filed within ten days of the entry of the final order of the District Court.

On December 6, 1962, within sixty days of the denial of the post trial motions, but not within sixty days of the original entry of judgment, petitioner filed a notice of appeal. The Government moved to dismiss the appeal. We held we did not have jurisdiction, and granted the motion to dismiss (318 F.2d 681). The Supreme Court granted certiorari and in a per curiam, five to four decision, reversed this Court and remanded for a hearing of petitioner's appeal upon the merits. Thompson v. Immigration and Naturalization Service, 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404.

Petitioner, a Canadian Citizen, was born in 1900. In 1922, he entered the United States on foot at Blaine, Washington, prior to the time immigration guards were assigned to that border. On January 30, 1946, petitioner applied for a certificate of arrival under 8 U.S.C. § 146 et seq., Nationality Act of 1940, and he filed a preliminary form for a petition for naturalization. He indicated his willingness to take the oath of allegiance to the United States and his willingness to bear arms upon behalf of this country. He certified that for more than ten years immediately prior to the statement that he did not believe in "anarchy or the unlawful damage, injury or destruction of property or sabotage." Petitioner certified "I am, and have been during all of the periods required by law, attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States."

Petitioner disclosed a conviction in 1923 and a pardon in 1940. He also disclosed three arrests in Cleveland, all in one day, "Over labor disputes; no fine and no sentence; no costs."

On January 12, 1946, the Immigration and Naturalization Service (INS) certified that Thompson's entry was lawful and that he had been admitted for permanent residence, both being prerequisites for naturalization under the 1940 Act.

Thompson's petition for naturalization was under the 1940 Act. As an alien married to an American citizen, he filed his petition on August 28, 1946 in the District Court under 8 U.S.C. § 710(b). The petition was sworn to and verified by two witnesses as required by the statute. Thompson took the following oath of allegiance:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or a sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign, and domestic; that I will bear true faith and allegiance to the same; and that I take the obligation freely without any mental reservation or purpose of evasion; SO HELP ME GOD. In acknowledgement whereof I have, hereunto affixed my signature."

On January 31, 1947, the Examiner for INS questioned petitioner about his

employment by the Industrial Workers of the World (IWW) as editor for the IWW paper. Petitioner answered all questions asked as to the IWW and stated his willingness to supply the Examiner with pamphlets published by the IWW, and to cooperate in any way. He stated he would bear arms on behalf of the United States even if the IWW were in control of the enemy country.

Then followed thirteen years of inaction. The record does not disclose why this petition was placed in mothballs for such a long period of time. At the oral argument before us, in response to a question from the bench, Government's counsel could not even hazard a guess as to the reason for this lengthy period that petitioner was kept waiting.

On July 18, 1960, a new Examiner resumed the questioning. However, the original Examiner was present and participated. For the first time, petitioner was represented by counsel.

Fourteen years after the petition had been referred for examination, the Naturalization Examiner, in May 1961, recommended to the Court that the petition for naturalization be denied. He found that "the petitioner has failed to establish that he has been attached to the principles of the Constitution and well disposed to the good order and happiness of the United States."

As in all naturalization cases, the only pleadings filed with the District Court were the petition and the Examiner's Findings, Conclusions and Recommendation. The Government's case was presented by the same two INS representatives who had acted as Naturalization Examiners. The petitioner presented two witnesses who testified as to Thompson's good moral character and that he was attached to the principles of the United States Constitution. The Government did not offer any witness, but limited its case to cross-examination of the petitioner and to documents which had been supplied by the petitioner.

Thompson testified he would bear arms on behalf of the United States if called upon to do so; he testified he never advocated violence or overthrow of the government; that he opposed the principles of the Communist party. He testified he was opposed to the principles of a group of the IWW who had control and published THE INDUSTRIAL WORKER during 1950–1953. The District Court adopted the Findings of Fact and Conclusions of Law of the Examiner.

The objection to granting Thompson's petition is based almost entirely on an unusual cross-examination. To understand the answer relied on by the Government, it is necessary that the examination be set forth in question and answer form:

"By Mr. Freedman:

"Q. Mr. Thompson, would you bear arms for the United States in the event this country went to war?

"A. Yes.

"Q. Under all conditions and all circumstances?

"A. I would understand that it would be my duty as a citizen of this country. In fact, I think I would be under the same obligation as a resident of this country.

\* \* \* \* \*

"Q. If the IWW, we will say, in Australia should by chance happen to take over the control of the means of production and the workers were to take over the country, and if that country declared war against the United States, would you then be willing to bear arms against that country?

"A. That's a mighty hypothetical question.

"Q. That is correct.

"A. You are asking me that if the workers in Australia take control of the means of production and declare war on the United States, would I fight for the United States. I suppose the answer is yes, though I can't imagine such a situation occurring.

"Q. I don't want to know what you suppose is the answer. What is

your answer? Would you or would you not do so?

"A. It is my obligation to defend the government of the country—

"Q. I am not interested in obligation. I am only asking you, would you or would you not bear arms?

"Mr. Patner: Your Honor, I think that the witness has a fair difficulty here, because the hypothetical question is so utterly remote. I think he has been asked and has answered four or five times whether he would bear arms under all circumstances on behalf of the United States were it to go to war. * * *"

The trial court intervened and directed petitioner to answer the question. Thompson replied: "Certainly, there is no getting away from it, I would be very reluctant to bear arms and have no doubt about that part." The Examiner insisted: "You still haven't answered the question, Would you or would you not? A. I would have to cross that bridge when I came to it. Q. You don't want to answer the question now? A. Well, I can't, I don't see how I can answer a question so remote from any conceivable probability."

These answers are the real basis for the Government's case. Petitioner, whose application had been kept dangling by the Immigration and Naturalization Service for over fourteen years and who had answered time after time that he would bear arms upon behalf of the United States, finally gave an equivocal answer to a question that was far-fetched to say the least.

■ Petitioner filed under the 1940 Act.° He was entitled to have his application considered in the light of the provisions of that Act. Menasche v. United States, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615. He should, in no way, be charged with the extraordinary delay which occurred. Furthermore, the 1952 Act contained a savings clause. The exceptions contained therein are not applicable here.

■ We hold the Findings of Fact of the Examiner adopted by the trial court, and the Conclusions, were clearly erroneous. The Finding as to the IWW is similar to the Finding as to the Socialist Workers Party which we disapproved in Scythes v. Webb, 7 Cir., 307 F.2d 905.

■ Thompson's petition for naturalization should have been granted. We therefore reverse and remand with instructions that a certificate of naturalization issue on the petition heretofore filed by Thompson.

Reversed and remanded.

SCHNACKENBERG, Circuit Judge (dissenting).

In my opinion the conferring of American citizenship upon appellant in this case should not depend upon unexplained delays in the administrative processes which accompanied a final administrative decision thereon. It should be controlled by the overriding importance of the inquiry as to where appellant stood in his professed loyalty to the United States of America. When faced by a question which required him to state under oath whether he would take up arms and defend the United States if it were attacked from sources originating in Australia and controlled by the Industrial Workers of the World (IWW), he gave several evasive answers. When he was pressed to answer a simple question categorically he gave an equivocal answer, as pointed out in the majority opinion.

However, I do not believe that appellant's equivocal answer to a question which this court considers farfetched can be justified on that ground. Similarly it might have been argued that an applicant for citizenship several years prior to World War I, or prior to World War II, might have been asked a similar question based upon the "farfetched" premise that Germany might later be at war with the United States. Yet world events have a way of aligning erstwhile friends as enemies. What court, or in fact, who, can predict the future when asking a probing question of a man whose loyalty

is being tested when he seeks to become a citizen of the United States?

One who harbors reservations in pledging loyalty to the United States is not entitled to citizenship therein. The nation is entitled to receive from each new citizen undivided loyalty and support of both of his hands without any fingers being crossed. I would affirm the order of the district court, which agreed with all of the relevant administrative rulings. To do otherwise would be to judicially sanction the creation of a new class of citizenship, which would be conditional and insecurely based upon the aberrations of loyalty of those in that class.