GREATER BOSTON TELEVISION COR-
PORATION, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

WHDH, Inc., a Massachusetts Corpora-
tion, Intervenor.

WHDH, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Greater Boston Television Corporation, a
Massachusetts Corporation, Intervenor.

CHARLES RIVER CIVIC TELEVISION,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

WHDH, Inc., Boston Broadcasters Inc.,
Intervenors.

WHDH, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Boston Broadcasters, Inc., Intervenor.

GREATER BOSTON TV CO., Inc.,
Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

WHDH, Inc., Boston Broadcasters Inc.,
Intervenors.

Nos. 17785, 17788, 23154, 23159, 23172.

United States Court of Appeals,
District of Columbia Circuit.

Dec. 29, 1971.

270

J. Joseph Maloney, Jr., Boston, Mass., for appellant and intervenor Greater Boston Television Corp.

William J. Dempsey, William C. Koplovitz, John H. Dempsey, Dempsey & Koplovitz, Washington, D. C., for appellant WHDH, Inc.

Harry M. Plotkin, Thomas Schattenfield, William L. Fishman, Washington, D. C., for appellant Charles River Civic Television, Inc.

Richard E. Wiley, Max D. Paglin, General Counsel, Daniel R. Ohlbaum, Associate General Counsel, Ruth V. Reel, Herman I. Branse, Ernest O. Eisenberg, Washington, D. C., for appellee FCC.

William J. Dempsey, Harry J. Ockershausen, William C. Koplovitz, Washington, D. C., for WHDH, Inc., intervenor.

Henry Geller, John H. Conlin, Lenore G. Ehrig, Edward J. Kuhlmann, Richard E. Wiley, Gen. Counsel, for appellee FCC.

Donald E. Ward, Benito Gaguine, Washington, D. C., for Boston Broadcasters, Inc., intervenor.

Vincent B. Welch, Gerald S. Rourke, Welch & Morgan, Washington, D. C., for Hampton Roads Television Corp. and Community Broadcasting of Boston, Inc., amici curiae.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

The latest turn in the Boston-TV Channel 5 controversy came on August 20, 1971, when the Federal Communications Commission filed a Request with this court to recall its mandate of June 23, 1971, affirming the FCC's order awarding a construction permit to Boston Broadcasters, Inc. (BBI). The Request was made for the purpose of permitting oral argument before the FCC to consider whether to reopen the comparative proceeding as to the action it should take in the light of information concerning charges that one of BBI's principals had violated securities laws in connection with a sale of unregistered stock of another company.

On one level the matter involves the conflicting objectives of finality of administrative disposition, and flexibility to serve the public interest by adjusting dispositions to take account of new material. On another level, the problem is one of sound relationships between a regulatory agency and a reviewing court. That broad reference suffices to give us a general bearing, and we proceed to the particular situation.

## I. PRIOR PROCEEDINGS

### A. *Prior to this court's opinion*

The mandate of affirmance sought to be recalled issued as the result of our opinion in Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. 383, 444 F.2d 841 (1971). The prior proceedings related there may be briefly capsuled. The applications filed in 1954 for Channel 5 were resolved in 1957 with a grant to WHDH, Inc., which began broadcasting that year. In 1958 we remanded for an evidentiary hearing on the possibility of an infirmity in the award due to improper ex parte contacts with the FCC's Chairman by Robert Choate of WHDH. In 1960 the FCC held that the grant to WHDH was voidable for such contact, granted temporary authorization for WHDH to continue broadcasting and reopened for a comparative proceeding. We approved that plan in 1961.

In 1962 the FCC again awarded a construction permit to WHDH, but granted an operating license for only four months. In 1963, the FCC designated the WHDH application for renewal for comparative hearing with applications filed during a specified 60-day period by BBI and others. In 1964 we suspended consideration of the appeals from the 4-month license and remanded for consideration of the impact of Mr. Choate's death. We authorized the FCC to consolidate this consideration with the comparative hearing already scheduled.

In 1966 the Hearing Examiner issued an initial decision in favor of granting renewal to WHDH. On January 23, 1969, the Commission reversed the decision of the Hearing Examiner, and entered an order denying the application of WHDH and granting that of BBI. The FCC duly denied rehearing, but it stayed the effectiveness of its decision and order until 30 days "after final dis-

position of any judicial review" of that order.[1]

The case was argued to us May 25, 1970, and on November 13, 1970, we filed a judgment of affirmance, and issued in support thereof our opinion,[2] cited above.

### B. *Between this court's opinion and mandate*

On November 30, 1970, WHDH filed a petition for rehearing and suggestion for rehearing en banc. Its motion for acceptance of a late filed petition was duly granted.

On January 7, 1971, WHDH filed a motion to hold in abeyance consideration of its petition for rehearing pending action by the FCC on its petition to the FCC to request this court to remand the case. WHDH submitted that newly-discovered evidence showed that a commissioner purporting to make up the necessary FCC majority had not voted in support of the FCC's 1969 decisions and order. Our order of February 16, 1971, denied both the petition for rehearing and the motion to hold in abeyance.

On March 3, 1971, the FCC issued a memorandum and order denying the WHDH petition requesting the FCC to apply to this court for a remand. On March 10, 1971, WHDH filed in this court its own motion to remand; this was denied on April 15, 1971.[3]

Our order of April 15, 1971, also made provision for stay of mandate to permit WHDH to seek Supreme Court consideration. We ordered that the stay be revoked unless WHDH filed a petition for certiorari on or before April 23, 1971, stating that was a date "we can be confident will permit Supreme Court disposition this term."

Certiorari was sought by WHDH on April 23, 1971. On June 14, 1971, the Supreme Court denied the certiorari petitions of both WHDH and the other appellants. The mandate of this court is-

---

1. By order of July 23, 1969. On August 21, 1969, BBI moved this court to vacate that stay. On January 16, 1970, we postponed decision on that motion to await consideration of the merits.

2. The opinion was amended, in minor respects, by our orders of December 30, 1970, and February 16, 1971.

3. See 21 R.R.2d 2061.

sued to the FCC on June 23, 1971. No stay of mandate was sought pursuant to either Supreme Court Rule 25(2) or FRAP 41(b).

## II. THE COMMISSION'S REQUEST TO COURT TO RECALL MANDATE

On July 23, 1971—the 30th day following its receipt of this court's mandate—the FCC adopted an order declaring that the stay it had ordered exactly two years earlier (see note 1) had "automatically vacated." It stated that WHDH should be afforded a reasonable opportunity to wind up its affairs and authorized WHDH to continue operating pending further order of the Commission. It issued construction permit BPCT-3170 to BBI on July 23, 1971, and a modified permit on July 29, 1971. Thereafter BBI began construction of its station in accordance with its permit.

The FCC filed on August 20, 1971, a Request that this court recall its mandate issued June 23, 1971, and remand for the limited purpose of authorizing the Commission to hear oral argument en banc to consider what procedure it should follow in light of a civil action brought by the SEC against Nathan H. David, a principal in BBI.

The papers before the FCC, filed in this court by leave, show that on April 2, 1971, BBI advised the Commission and all parties of the filing of an action against Mr. David by one David Freedman, alleging violation of security laws in connection with Freedman's purchase of unregistered stock in Synergistics, Inc., from certain officers and directors of that company in a transaction arranged by Mr. David. On April 21, 1971, WHDH filed with the Commission a petition for further proceedings based on these allegations and the lawsuit. Various additional pleadings were filed. On July 29, 1971, WHDH filed a copy of the SEC's complaint filed that day against Synergistics, Inc., which listed Mr. David as a defendant.

The Commission's Request states that the Commission has made no assessment of these filings, that they are relevant on their face because the Commission's decision attached substantial importance to the criterion of integration (participation in management by owners) and Mr. David's participation entered into its determination favoring intervenor BBI with respect to this criterion. The Request further states that the Commission recognized the need for expedition, and would, if authorized by the court, hold argument and decide within a month whether reopening the comparative case would serve the public interest and what other procedures might be appropriate.

BBI filed an Opposition to the FCC's Request.[4] WHDH filed a Response stat-

---

4. Intervenor BBI filed on September 2 its Opposition to the Commission's Request as unwarranted and contrary to the public interest. BBI submits: This action would disturb the finality this proceeding has at last achieved. It would enable WHDH to continue on an interim basis a profitable operation giving it an unjust enrichment already stretched to unconscionable duration. BBI has proceeded with irrevocable commitments and expenditures for construction of some $4 million. Employees have been recruited, and BBI will be ready to be on the air on the target date of September 12, 1971. Any legitimate interest which the Commission may wish to protect by further consideration of the SEC allegations against Nathan H. David, holder of some 6–7% of BBI's stock, "can be protected, more than ade-

quately, in other ways not involving any recall by this Court of its mandate."

BBI's Opposition puts before us letters from BBI and Mr. David to the Commission, dated August 17, 1971. Mr. David's letter advises that he is vigorously contesting the actions against him, denying all material allegations, and seeking an early determination; submits that any delay would visit gross inequity on a substantial number of persons of excellent background; that if the Commission deems appropriate as a condition for granting BBI authority for prompt commencement of its operations he would enter upon a leave of absence, which BBI would grant, from his offices as director, general counsel and executive vice president of BBI, and would refrain from voting his stock in BBI, until such time as the Commission re-

ing that it was bringing these matters to the attention of the Supreme Court—where it had on July 9, 1971, filed a petition for rehearing of the denial of certiorari—and that the request should be both broader as to the scope of remand than had been sought by the FCC and should be addressed "initially" to the Supreme Court.

On September 30, 1971, this court entered an order as to further procedure which advised that we proposed to defer action until the Supreme Court acted on the WHDH petition for rehearing. We also requested that, in the event such rehearing was denied by the Supreme Court, the Commission file with this court a supplement to its Request setting forth

(a) A submission of the respects if any in which the Commission considers that the actions of intervenor BBI (including its officers, directors and controlling stockholders) have compromised the integrity of either the administrative process or the judicial process by reason of any misrepresentation to the tribunal, secret influence or like matter.

(b) A submission of the authority of this court, with discussion of such statutory provisions as may be material, to order the recall of a mandate entered in accordance with this court's opinion, on the basis of newly discovered evidence on matters determined by the Commission.

(c) A submission: (1) Whether the Commission has authority to protect the public interest in the premises by insert-ing conditions separating Mr. David from any continuing interest or office in BBI, pending further consideration by the Commission, and upon final determination by the Commission if it so orders. (2) The respects, if any, in which such conditions would fail to preserve the public interest.[5]

The Supreme Court denied the WHDH petition for rehearing on October 12, 1971. The FCC filed its Supplement. Our growing file also includes subsequent submissions by both WHDH and BBI, including the information that on November 12, 1971, Mr. David was indicted in the Massachusetts state court on the misdemeanor of involvement in the sale of securities without proper notice to state officials. Leave for all these filings is hereby granted.

## III. GENERAL DOCTRINES APPLICABLE TO RECALL OF APPELLATE MANDATE

We approach the problems raised by the Commission's request to this court to recall its mandate by first reviewing what may be termed the general doctrines of appellate justice concerning recall of mandate—power, procedure, and grounds of action.

### 1. *Concept of expiration of "term" of no current significance*

■■ The FCC puts it as a matter of consequence that its request for recall of mandate was filed within the same term as the mandate. This was indeed a consideration of decisive significance un-

---

leased those conditions, all without prejudice to whatever the Commission may subsequently consider to be the appropriate disposition of the charges against him. This letter concludes "I reaffirm that I consider the Commission has jurisdiction to make rulings in these areas, and agree to take such action as may be required by any final order in the premises."

BBI's Opposition further submits that the Commission's power to condition its permit would not benefit WHDH, Inc. BBI further submits that the Commission has authority to protect the public interest by instituting investigatory pro-ceedings (§ 403), revocation proceedings (§ 312) and proceedings to modify construction permits or licenses (§ 316).

5. We also requested to be advised whether the use of such conditions represents the practice of the Commission, when allegations relate to matters not within the Commission's jurisdiction. The Commission has apparently followed such a course in some prior cases, but questions have been raised whether such prior practice is strictly comparable. We have concluded that our disposition of the FCC's Request does not require us to delve further into the issue.

der the common law "term" rule applied by the Federal courts. That doctrine stated that all judgments and orders of a court "however conclusive in their character" are under the control of the court during the term when rendered, but, unless steps be taken during the term, final judgments "pass beyond its control" to correct errors. Bronson v. Schulten, 104 U.S. 410, 415, 26 L.Ed. 797 (1882). However the significance of the "term" concept was removed by the enactment in 1948 of 28 U.S.C. § 452: "The continued existence or expiration of a term of court in no way affects the power of the court to do any act or take any proceeding."

While this section of the Judicial Code is generally referred to for its provision liberating the courts from an incapacity because of expiration of the term, the provision flatly states that "the continued existence of a term" does not affect the power of the court. Our researches disclose nothing pertinent in the legislative history to qualify the impact of these words. The amendment in 1963, changing "term" to "session," wrought no substantive change.

Our conclusion is that the continuance of the "term" is without importance.

The rules of our court do establish that the court has one term each year, beginning the second Tuesday of September each year. But the change in term is without significance in terms of power, or even for that matter in administration.[6] The court's decision whether to use the power to recall a mandate may of course be affected by the timeliness of the request,[7] but a request may reflect untimeliness though filed 11 months after judgment, at the same term, and may reflect diligence, though filed at a different "term," when filed only two months after mandate. The "term" concept is not of itself of importance.

2. *Inherent authority of appellate court to recall mandate to prevent injustice*

When the "term" concept was abolished for Federal district courts by the Federal Rules of Civil Procedure, a rule was adopted, Rule 60, which defined the authority of the district courts to take action—within the same proceeding—to correct, clarify and modify outstanding judgments. Rule 60 states both grounds of action and time limits.[8] It also expressly preserves the jurisdiction, where appropriate, to entertain a new proceed-

6. Statistics are kept by the Administrative Office on a fiscal year basis. The Judicial Council has directed the Clerk to publish reports concerning the court's work on a calendar basis every quarter.

When this court's docket numbering was changed in 1971 from a continuing numerical sequence, it was changed so as to identify the calendar year of filing.

7. Certainly a party who knows the facts and fails to make timely presentation to the appellate court takes the risk that what would ordinarily be clear grounds for recall of mandate will be unavailing. This was even applied to an allegation of fraud on the court in Cord v. Smith, 370 F.2d 418 (9th Cir. 1966). And we have declined to take action tantamount to revising an earlier mandate because of an error in the transcript before us, when the party did not bring the error timely to the court's attention by seeking enlargement of its remand order, and there might possibly have been advantageous consequences from such

omission. NLRB v. Sagamore Shirt Co., 130 U.S.App.D.C. 384, 401 F.2d 925 (1968).

8. Rule 60 is captioned "Relief from Judgment or Order." Subsection (a) relates to "clerical mistakes," which may be corrected "at any time." Subsection (b) permits relief on ground of (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence; (3) fraud (whether intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) void judgment; (5) satisfaction "or it is no longer equitable that the judgment should have prospective application"; or (6) "any other reason justifying relief from the operation of the judgment."

As to time limits Rule 60(b) provides: "The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

ing or action to vacate or provide relief against a mandate.[9]

When the "term" concept was abolished for the Federal appellate courts by 28 U.S.C. § 452, no rule was adopted that expressly covered the subject of modification of judgments.

Rules 40 and 41 of the Federal Rules of Appellate Procedure (FRAP), effective July 1, 1968, specify time limits for issuance of the mandate and for petitions for rehearing.[10] These rules also contain provision for stay of mandate to permit consideration of a petition for rehearing or petition for certiorari, and permit the court to enlarge or shorten times prescribed.[11]

■ In the absence of express provision on recall of appellate mandate, in either FRAP or the Rules of our court, we turn to general doctrine. In our view that doctrine has the same content as the rule of court discussed in Hines v. Royal Indemnity Co., 253 F.2d 111, 114 (6th Cir. 1958): "A mandate once issued will not be recalled except by order of the court for good cause shown." The "good cause" requisite for recall of mandate is the showing of need to avoid injustice. "Usually the issuance of a mandate by this court means that the litigation has come to an end. . . . This court can, however, recall its mandate to prevent injustice." Gradsky v. United States, 376 F.2d 993, 995 (5th Cir. 1967).

■■ While the authority of the appellate court to recall a mandate to prevent injustice is not expressly set forth in a statute, it has a foundation in statute as well as the inherent power of a court. We refer to 28 U.S.C. § 2106—a longstanding provision that was reiterated in the 1948 enactment of the Judicial Code that abolished the "term" concept. Section 2106 expressly authorizes an appellate court to affirm, modify, or vacate any judgment or order of a court brought before it for review, and enter such judgment or require such further proceedings "as may be just under the circumstances." 28 U.S.C. § 2106. While § 2106 applies in terms only to review of a court order, its basic principle is not inapposite to appellate review of agency orders.

3. *Particular grounds for recall of mandate*

a. *Need to show special reason*

■ While there is a doctrine for recall of mandate broadly rooted in a showing of "good cause" and the need to "prevent injustice," the "power to recall mandates should be exercised sparingly" and is not to be availed of freely as a basis for granting rehearings out of time for the purpose of changing decisions even assuming the court becomes doubtful of the wisdom of the decision that has been entered and become final. Estate of Iverson v. Comm'r, 257 F.2d 408, 409 (8th

9. Rule 60(b) concludes: "This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding," "or to set aside a judgment for fraud upon the court."

10. Rule 40, Petition for Rehearing, provides: "A petition for rehearing may be filed within 14 days after entry of judgment unless the time is shortened or enlarged by order." Rule 41, Issuance of Mandate, provides that, unless an order is entered shortening or enlarging the time: (1) The mandate shall issue 21 days after entry of judgment. (2) A timely petition for rehearing will stay the mandate. If it is denied, the mandate shall issue 7 days after entry of the order. (3) A party may apply for a stay of mandate pending preparation and disposition of a petition for certiorari. If such a stay is granted and a petition is filed "the stay shall continue until final disposition by the Supreme Court. Upon the filing of a copy of an order of the Supreme Court denying the petition for writ of certiorari the mandate shall issue immediately."

11. We exercised our discretion in this case when our order of April 15, 1971 granted a stay of mandate to be revoked unless the petition for certiorari was filed by April 23. This was in the context of the issuance on February 16, 1971, of the order denying the petition for rehearing filed by WHDH in November, 1970.

Cir. 1958). *See* Legate v. Maloney, 348 F.2d 164, 166 (1st Cir. 1965): "If we were in error . . . we believe it would be far greater error to permit reconsideration now after denial of petitions for rehearing and certiorari. There must be an end to dispute." [12]

■ There must be special reason, "exceptional circumstances," in order to override the strong policy of repose, that there be an end to litigation. Hines v. Royal Indemnity Co., 253 F.2d at 114.

The recall of a mandate may thus be referred to as the exception rather than the rule, but it is an exception that has generated certain rules, or sub-rules, and it may be helpful if we take account of at least some of these.

b. *Correction of clerical mistakes and clarification of mandate and opinion*

■ The clearest reason for recall or revision of appellate mandate is to exercise the court's power to recall its mandate—at any time—to correct clerical mistakes,[13] or to make the judgment consistent with the opinion. Kinnear-Weed Corp. v. Humble Oil, 296 F.2d 215 (5th Cir., 1961); cf. Klapprott v. United States, 335 U.S. 601, 616, 69 S.Ct. 384, 93 L.Ed. 266, judgment modified, 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 1099 (1949).

■ An appellate court likewise has continuing power to accept and pass upon a petition to clarify an outstanding mandate. Bailey v. Henslee, 309 F.2d 840 (8th Cir. 1962); Meredith v. Fair, 306 F.2d 374 (5th Cir. 1962); [14] *cf.* McNally v. Teets, 352 U.S. 886, 77 S.Ct. 134, 1 L.Ed.2d 923 (1956).

c. *Fraud on the court, or other misconduct affecting integrity of judicial process*

■ There is firmly established in the law the doctrine confirming the power of a court to set aside at any time any mandate that was procured by effecting a fraud on the court. Cord v. Smith, 370 F.2d 418, 423 (9th Cir. 1966). In holding that this paramount doctrine overrode the "term" rule even when that was in force, the Supreme Court said, in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), that the "deep-rooted policy in favor of the repose of judgments" and the interest in finality, must yield to the overriding interest of "correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule," where enforcement of the judgment is "manifestly unconscionable." [15]

The spirit of the "fraud on the court" rule is applicable whenever the integrity of the judicial process or functioning has been undercut—certainly in any instance of misconduct by a party.[16]

d. *Avoidance of differences in results to cases pending at the same time*

In significant instances where appellate courts have found special reason for disturbing repose and finality in the interest of justice, the underlying consid-

12. The court reserved the possibility of a motion to recall mandate if a subsequent Supreme Court decision "showed that our original judgment was demonstrably wrong."

13. The power is expressly confirmed for district courts by Rule 60, F.R.Civ.Pr.

14. The court without referring to 28 U.S.C. § 452 noted that the term had not ended, and cited pre-1948 authorities noting that factor, 306 F.2d at 378.

15. 322 U.S. at 244–245, 64 S.Ct. at 1000, citing Pickford v. Talbott, 225 U.S. 651,

657, 32 S.Ct. 687, 56 L.Ed. 1240. The Court concluded (322 U.S. at 245, 64 S.Ct. at 1001):

> "Where the situation has required the court has, in some manner, devitalized the judgment."

16. But the concept of fraud on the court as vitiating proceedings does not extend to an omission more fairly characterized as a "mistake of judgment." Shotwell 358, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963). Mfg. Co. v. United States, 371 U.S. 341,

eration has been the interest in avoiding differences of result for cases pending at the same time. Thus, in *Gradsky, supra,* where some defendants sought certiorari and obtained a remand, the court extended its remand to codefendants to give the benefit of the same principle. In United States v. Ohio Power Co., 353 U.S. 98, 99, 77 S.Ct. 652, 1 L.Ed.2d 683 (1957), the Court referred to the interest of "uniformity in the application of the principles announced in those two companion cases," and stated "that the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of our rules." *Compare* Sun Oil Co. v. Burford, 130 F.2d 10, 13 (5th Cir. 1942), recalling mandate entered earlier at the same term to avoid any injustice due to intracircuit conflict.

### e. *Need to revise unintended instruction to trial court that produces unjust result*

 Another example of revision to prevent injustice may come where an appellate judgment contains an instruction—on a point or in an application that was not deliberately intended by the appellate court—that would operate, unless changed, to require the district court to issue an unjust order.[17] The need for this doctrine is interrelated with the "mandate" rule, which prohibits the district court from departing from the appellate instruction without special leave.[18]

 In this regard it has been said that the "mandate" rule is related to the doctrine of "law of the case," as a doctrine to achieve finality.[19] It has always been recognized that the "law of the case" is a doctrine of "judicial administration" that does not limit the power of the appellate court.[20]

### f. *Other grounds of injustice*

 The recall of an appellate mandate to avoid injustice is a continuation, in the appellate sphere, of a deeply rooted equity jurisprudence. Historically there was an "independent" equity action to restrain enforcement of a judgment to avoid an unconscionable injustice, with "fraud on the court" being the best known but not the exclusive ground for relief. Rule 60 expressly provides that it does not eliminate an "independent" action in the district court either "to set aside a judgment for fraud upon the court" or "to relieve a party from a judgment" on other grounds. 7 J. Moore, Federal Practice ¶ 60.36 et seq. It is not clear whether the concept of an independent action is strictly limited to "extrinsic fraud," as was often said, but it is clear that the exception for equitable interposition by independent suit rests on "stringent" rules limited to circumstances "which render it manifestly unconscionable that a judgment be given effect." 7 J. Moore, Federal Practice ¶ 60.37[1], p. 623. If a case involves the kind of injustice that would support an independent suit in the trial court, but presents an instance where action is needed from an appellate court, which cannot entertain a new "independent" action, the remedy of recall of mandate may well be appropriate.

### 4. *Newly-discovered evidence claims considered by appellate court only when and to the extent needed to permit consideration by trial court*

The case before us involves newly-discovered evidence. Historically such a

---

17. Cf. Cahill v. New York, N.H. & H.R. Co., 351 U.S. 183, 76 S.Ct. 758, 100 L.Ed. 1075 (1956).

18. Briggs v. Pennsylvania R. Co., 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948) ; cf. United States v. Haley, 371 U.S. 18, 83 S.Ct. 11, 9 L.Ed.2d 1 (1962).

19. Banco Nacional de Cuba v. Farr, 383 F.2d 166, 178 (2d Cir. 1967).

20. Messenger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) ; Industrial Workers of World v. Clark, 128 U.S.App.D.C. 165, 171, 385 F.2d 687, 693 (1967) ; Naples v. United States, 123 U.S.App.D.C. 292, 359 F.2d 276 (1969).

claim was entertained by *e. g.*, a motion for new trial—or in equity a "bill of review," now superseded by Rule 60(b)— and such remedies were accepted on the ground that "these proceedings are all part of the same suit, and the rule framed for the repose of society is not violated."[21]

▮ In the district courts motions in the same proceeding may now be made only under Rule 60(b), which provides a one-year time limit as to newly-discovered evidence. Significantly, this time is *not* extended by the maintenance of an appeal. Therefore appellate jurisprudence is typically concerned with a claim of newly-discovered evidence only when appellate action is necessary to make the claim cognizable by a district court—by motion under Rule 60(b), or perhaps in exceptional cases by independent action.

▮ Appellate courts evolved special rules and practices where necessary to overcome technical problems that prohibited district court consideration in the absence of appellate permission. We identify these problems and their solutions in a footnote[22] for, as will appear it is not these problems but others that are dominant where the appellate court is reviewing agency orders. It suffices

to say that the appellate court ordinarily revises a mandate of affirmance only because, and to the extent that, such revision is necessary to permit district court consideration (see note 22). Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., 350 F.2d 885, 893 (5th Cir. 1965) (on petition to reopen decision).

## IV. CONSIDERATIONS APPLICABLE TO RECALL OF APPELLATE MANDATE AFFIRMING AN AGENCY ORDER

We now focus on the particular considerations that are applicable to a request for recall of an appellate mandate affirming an order of an independent regulatory commission.

1. *Appellate court's general relationship to agency whose order is under review*

▮ We need not reiterate the salient principles of judicial review of agency disposition canvassed in our 1970 opinion. The central point is the combination of the court's "supervisory" function, to review agency decisions and assure that there has been conformance with pertinent requirements of law, and its responsibility of restraint, to avoid

---

21. United States v. Throckmorton, 98 U.S. 61, 65, 25 L.Ed. 93 (1878).

22. The District Court has no jurisdiction to grant relief while the case is pending on appeal. This court has adopted the rule that the motion to provide relief may be considered by the district court while the appeal is pending; if that court indicates that it will grant relief the appellant should move in the appellate court for a remand in order that relief may be granted. Smith v. Pollin, 90 U.S.App. D.C. 178, 194 F.2d 349 (1952).

A majority of the circuit courts of appeals have approved our procedure. 7 Moore's Federal Practice ¶ 60.30[2]. But there are some decisions requiring that a motion be made in the appellate court, which will permit the trial court to consider the Rule 60(b) motion only where the showing reasonably indicates that, if leave is granted, the trial court might properly grant the motion. Baruch v.

Beech Aircraft Corp., 172 F.2d 445 (10th Cir.), cert. denied, 338 U.S. 900, 70 S.Ct. 251, 94 L.Ed. 554 (1949).

A separate problem is presented where the appellate court has already affirmed the district court judgment and issued its mandate. While there are conflicting views, the prevailing position holds that notwithstanding Rule 60(b) the trial court has no power to grant relief because of the "judgment" rule prohibiting the district court from departing without leave from the judgment of an appellate court. Butcher & Sherrerd v. Welsh, 206 F.2d 259, 262 (3rd Cir. 1953), cert. denied, Aiker v. Butcher, 346 U.S. 925, 74 S.Ct. 312, 98 L.Ed. 418 (1954). The rule has been extended to the case where the mandate of the district court was entered after a reversal and remand. Wilson Research Corp. v. Piolite Plastics Corp., 336 F.2d 303 (1st Cir. 1964). See 7 Moore's Federal Practice, ¶ 60.30[2] for discussion of authorities.

intrusion into the area of discretion, and choice of policy, vested by Congress in the agency.

The conjunction of supervision and restraint yields a collaborative partnership between agency and court in furtherance of Congressional purpose and the interest of justice. See Greater Boston Television Corp. v. FCC, 444 F.2d at 851–852 (omitting footnotes):

> The process thus combines judicial supervision with a salutary principle of judicial restraint, an awareness that agencies and courts together constitute a "partnership" in furtherance of the public interest, and are "collaborative instrumentalities of justice." The court is in a real sense part of the total administrative process, and not a hostile stranger to the office of first instance.

2. *Court's orders and mandates must preserve and respect distinctive administrative role of agency*

 These general principles have a corollary as to a court's mandates: they must preserve and respect the distinctive administrative role of the agency and not encroach on its permissible zone of discretion.

The considerations are presented in FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940). The Company's application, for a permit to construct a broadcast station, was denied by the FCC in part on the ground that it was financially disqualified, and a court reversed and remanded "for reconsideration in accordance with the views herein expressed." On remand, the FCC set the application for hearing on a comparative basis with two others. Applying standard doctrine governing review of trial courts—the "judgment" rule discussed in note 22 of this opinion—the reviewing court held the FCC could not reconsider matters determined by its mandate.

The Supreme Court reversed and held that once the legal errors of the FCC were undone, it was left with its statutory responsibility of considering pending applications under the statutory standard of "public convenience, interest, or necessity." In principal passages of the opinion, see 309 U.S. at 140–144, 60 S.Ct. at 441, Justice Frankfurter stressed that courts must take account of the "vital differentiations between the functions of judicial and administrative tribunals" under review, that the rules for appellate review, of a lower court as "only one phase of a single unified process" cannot be "taken out of their environment [and] mechanically applied to determine the extent to which Congressional power, exercised through a delegated agency, can be controlled." The distinctive powers and procedures vested in the administrative agencies must be given due consideration, assuming adherence to rules of fair play. "[To] assimilate the relation of these administrative bodies and the courts to the relationship between lower and upper courts is to disregard the origin and purposes of the movement for administrative regulation and at the same time to disregard the traditional scope, however far-reaching, of the judicial process."

In the companion case of Fly v. Heitmeyer, 309 U.S. 146, 60 S.Ct. 443, 84 L.Ed. 664 (1940), the Court held that the FCC could not only consider the application it had denied, for a reason contrary to law, on a comparative basis with others, but could also reopen the record and take new evidence. See 309 U.S. at 148, 60 S.Ct. at 444:

> If, in the Commission's judgment, new evidence was necessary to discharge its duty, the fact of a previously erroneous denial should not, according to the principles enunciated in the *Pottsville* case, supra, bar it from access to the necessary evidence for correct judgment.

The sweep of *Pottsville* was cut back when Congress, on July 16, 1952, amended 47 U.S.C. § 402 by adding subsection (h), providing that in the event of a court decision reversing an order and remanding the case to the FCC "to carry out the judgment of the court" the FCC

had the duty "unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record which said appeal was heard and determined." The Committee report stated that the addition was "intended to confer upon the appellate court a measure of control commensurate with the dignity and responsibility of that tribunal." [23]

WHDH, Inc., argues that section 402 (h) is applicable only in case of reversal and remand, and imposes no similar duty on the FCC to be limited by a court mandate of affirmance. We see no basis for inferring that this law, passed to restrict FCC latitude to reopen the record in case of reversal, was meant to augment that latitude in case of affirmance. The purpose to ensure deference to the court's intention in its disposition, does not suggest an intent to affect any preexisting power the court had, consistently with *Pottsville*, to provide for reopening of the record after affirmance. The FCC's Request rests on the thesis that the reopening of the proceeding is in furtherance of its statutory function. We address ourselves to that issue, as is our duty under *Pottsville*.

3. *Relative dominance of interests of administrative flexibility, and permission for FCC to consider new circumstances, prior to issuance of final order*

We are concerned with competing objectives of flexibility and repose.

The general interest of repose gains dominance, in our view, with the issuance of a "final" administrative order—a term here used to designate an order which is no longer subject to appeal to the court, for which no administrative

reconsideration is permitted by the regulatory statute.

Prior to the effective date of a final administrative order, the interests of administrative flexibility, and securing of the right result in the particular case, have relative dominance—and they permit appellate direction for reopening of proceedings, in appropriate cases.

■■■ There is undoubted authority of the FCC to reconsider an order it has entered before it has become final. It may of course consider petitions for reconsideration in order "to correct errors or to hear newly discovered evidence before an appeal." Saginaw Broadcasting Co. v. FCC, 68 U.S. App.D.C. 282, 286, 96 F.2d 554, 558 (1938). Within the period provided therefor by the statute a petition for reconsideration is filed as a matter of procedural right, without need for leave, and it serves to reopen the case and to require FCC consideration. Southland Industries, Inc. v. FCC, 69 App.D.C. 82, 86, 99 F.2d 117, 121 (1938); Black River Valley Broadcasts v. McNinch, 69 U.S. App.D.C. 311, 101 F.2d 235, 240 (1938), cert. denied, 307 U.S. 623, 59 S.Ct. 793, 83 L.Ed. 1501 (1939).

■ In Enterprise Co. v. FCC, 97 U.S.App.D.C. 374, 231 F.2d 708 (1955), this court held that the FCC's duty to accord reconsideration entailed a duty to take into account a "material" change— the merger between the winning applicant and another applicant whose other media interests had been substantially responsible for denial of its application —taking place during the reconsideration period, and indeed shortly prior to argument before the FCC on petition for

23. See S.Rep. No. 44, 82nd Cong. 1st Sess. (1951) 12:

Subsection (h) contains provisions which are intended to confer upon the appellate court a measure of control commensurate with the dignity and responsibility of that tribunal, requiring the Commission to give effect to the judgment of the court in the absence of proceedings to review. The committee points out that under the language of this subsection the appellate court would have ample authority, either on its own motion or upon the petition of the Commission or any other litigant, to provide, either as a part of its original decree or supplementary thereto, that new parties and new issues may be introduced and a new record made after remand to the Commission. This authority stems from the phrase "and unless otherwise ordered by the court."

reconsideration. Even when such petition for reconsideration has been denied, so long as the time for appeal to the court has not expired the FCC has jurisdiction to provide reconsideration in its sound discretion. See Albertson v. FCC, 87 U.S.App.D.C. 39, 41–42, 182 F. 2d 397, 399–401 (1950).

4. *Court remand in the interest of justice for consideration of "core" change in circumstances subsequent to administrative decision*

 Once a petition to review has been filed in court, the FCC has no authority to conduct further proceedings without the court's approval. The reviewing court must order a remand if there is to be provision for further administrative consideration. 28 U.S.C. § 2347(c); Anchor Line Ltd. v. FMC, 112 U.S.App.D.C. 40, 299 F.2d 124 (1962); McClatchy Broadcasting Co. v. FCC, 99 U.S.App.D.C. 199, 239 F.2d 19 (1956), cert. denied, 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665 (1957).

 The clearest case for remand appears when there is an allegation of impropriety, comparable to a charge of fraud upon the agency, such as improper influence on or contact with a commissioner, raising questions of possible disqualification of the commissioner, or of the party, and of a conclusion that the award may be void or voidable.[24]

This court's decisions in various cases also reflect a doctrine favoring remand, in the interest of a just result, where there has been a change in circumstances, subsequent to administrative decision and prior to court decision, that is not merely "material" but rises to the level of a change in "core" circumstances, the kind of change that goes to the very heart of the case.[25]

The leading case is Fleming v. FCC, 96 U.S.App.D.C. 223, 225 F.2d 523 (1955). The court ordered remand prior to its review of the merits—for the FCC to consider the significance of the death of Paul McNutt, a partner in the appellant "Anthony Wayne" firm. The significance of this death was established by the fact that, as our opinion noted, the FCC had found the appellant firm the better qualified applicant—save for the demerit of the fact that the partners, McNutt and Fleming, were minority stockholders in the morning newspaper company and had not taken steps to cause that company to abandon certain joint advertising rate practices. When Mr. McNutt died before the appeal was argued, the court called for supplemental briefs. All parties urged disposition of the appeal on the existing record. The FCC opposed a remand for its determination of the effect of McNutt's death unless the court reversed on the present record. The winning station challenged the court's authority to remand without a reversal. By this time Congress had passed § 402(h), providing for remand instructions in case of reversal. But this court, citing the *Ford Motor* decision,[26] held that a remand was appropri-

---

24. *E. g.*, WKAT v. FCC, 103 U.S.App.D.C. 324, 258 F.2d 418 (1958); Massachusetts Bay Telecasters, Inc. v. FCC, 104 U.S. App.D.C. 226, 261 F.2d 55 (1958), cert. denied 366 U.S. 918, 81 S.Ct. 1094, 6 L. Ed.2d 241 (1961). However, in the absence of an indication of misconduct or bias, remand will not be granted in order to probe the mental processes of the commissioner—as we noted in our prior order in this proceeding, upholding the FCC's decision not to join in a WIIDH request for remand that was based on a press article quoting a former commissioner as giving a reason for concurring in the FCC's decision that was different from that set forth in the decision itself. Or-

der of April 15, 1971, 21 RR2d 2061. See United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

25. A change in circumstances obviously involves different considerations from newly-discovered evidence concerning prior conditions. There would certainly be no doubt of the need for a court remand if the change of circumstances were such as to make the case moot.

26. In Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939), the court held that notwithstanding the absence of express statutory provision for a remand in the absence of re-

ate even prior to decision, and even assuming the agency was without fault, if "the state of the record may preclude a just result." [27]

This court has followed *Fleming* in other cases remanding for consideration of the death of a principal occurring prior to any decision on the merits. Southland Television Co. v. FCC, No. 13,021, remanded October 2, 1956; WMJM Broadcasting Corp. v. FCC, No. 16,052, remanded November 18, 1960.

The *Southland* case involved the death of Don George, a 43% partner of the winning applicant, and the proposed general manager. The FCC had expressly accorded "the greatest weight" to the proposal that he have full charge of day-to-day operations. The FCC decision granting the construction permit issued May 20, 1955, petition for reconsideration was denied November 17, 1955, an appeal was taken, and Mr. George died on June 7, 1956, shortly after the main briefs were filed.

The appellant's request for a remand was opposed by the FCC, which objected to the application of *Fleming* and stressed the need for finality [28] in the administrative process.

The court deferred disposition until it had heard argument on the remand and the merits. Its order of October 2, 1956 "remanded to the Commission with directions to reconsider its decision in the light of the circumstances that, by rea-

son of the death of Mr. Don George, the facts to which the Commission attached greatest weight no longer exists." Certiorari was denied.[29]

The *WMJM* case involved the death of the president and "principal movant" of a winning applicant, a nonprofit organization which proposed that he be the general manager and program director. In giving that organization a preference, the FCC had relied heavily upon the integration and participation, broadcast experience, programming experience, and representations of this individual. The intervenor's motion set forth that such death required reconsideration—"where, as here, the validity of the decision is sub judice"—and the FCC acquiesced, citing *Fleming*.

We also note that in an earlier phase of this Channel 5 litigation, when this court was advised of the significance of the death of Mr. Choate, who was both "an important factor favorable to WHDH and was also the cause of the demerit against that applicant," [30] it remanded for FCC consideration of the significance of Mr. Choate's death. Greater Boston Television Corp. v. FCC, 118 U.S.App.D.C. 162, 334 F.2d 552 (1964).

5. *Remand withheld when new items, though material, were not central and conditions could be inserted to avoid an unjust result*

▮ Not every change in circumstances that would have been material,

versal, a remand without decision of the merits is appropriate where consonant with the purposes of both the administrative proceeding and judicial review— to "secure a just result with a minimum of technical requirements."

27. 96 U.S.App.D.C. at 226, 225 F.2d at 526.

28. Its Opposition stated (pp. 2–3):
The necessity for fixing a point where a decision becomes final and not subject to change because of subsequently occurring facts is undisputed, particularly where, as here, the proceeding requires a comparative evaluation of the qualifications of competing applicants for a new license. At some point new circumstances, including changes in the constitution and proposals of the appli-

cants, must be considered as coming too late for inclusion in the comparative weighing process; the alternative is an open-ended proceeding whose ultimate conclusion might well be completely frustrated.
The FCC contended that under 47 U.S.C. § 405 the FCC loses jurisdiction to reopen a record to consider subsequent events when an appeal is taken, or the time for appeal has expired, and that the court cannot confer jurisdiction on the FCC by a remand.

29. Shreveport Television Co. v. FCC, 352 U.S. 1014, 77 S.Ct. 560, 1 L.Ed.2d 547 (1957).

30. WHDH, Inc., 22 F.C.C. 767, 865 (1957).

and taken into account by the FCC, if part of the administrative record, calls for remand by the court. We refer to our 1966 decision in Community Broadcasting Corp. v. FCC.[31] In that case the FCC granted a four-month operating license to Sunbeam Corporation in 1961, following the disqualification of the other applicants in a comparative proceeding for misconduct in relation to the adjudicatory processes of the FCC. Following a comparative hearing Sunbeam's renewal application was granted by the FCC, notwithstanding the greater area familiarity of appellant Community, because of the knowledge, experience and insight into the needs of the service area of the three long-term local residents who owned 51% of Sunbeam stock. We affirmed, and among other things upheld the FCC's determination that Sunbeam should not be disqualified for tardiness in reporting changes in the investing group—changes considered "not surprising" in view of the delay involved. We also considered appellant's motion to remand, filed prior to oral argument, based on the fact that a Miami lawyer who was a director and 10% stockholder of Sunbeam had been indicted for mail fraud. The FCC opposed remand.[32] We denied the remand, saying (124 U.S.App. D.C. at 232 n.1, 363 F.2d at 719, n.1):

> But it clearly appears that the subject matter of this indictment is wholly unrelated to Sunbeam, and that the lawyer in question has stepped out as director and sold his stock on terms which assure that he can resume his connection with Sunbeam only if he is cleared of the charges against him. Under these circumstances, and especially in view of the long delay to which Sunbeam has, through no fault of its own, been exposed in its quest for a license, we think a remand is not necessary.

In view of our *Community* opinion we take note, as BBI points out, that the activities of Mr. David which led up to the SEC action (and the subsequent indictment) were not related either to BBI or to any matter within FCC cognizance.

We also have taken into account, as brought out in the FCC's Request for Remand, that its 1969 decision attached "substantial importance" to the criterion of integration ("participation in the station management by owners"),[33] and that Mr. David's position and holdings as a 6–7% stockholder, contributed to the FCC's ultimate conclusion.

In offset, BBI responds that BBI's relative strength on integration was undeniable even without Mr. David's stock, in view of the 8.26% stock interest in Mr. Burdick (general manager) and Mr. Pickard (director of news and public affairs) whose "operating experience" was particularly stressed by the FCC.[34] And

31. 124 U.S.App.D.C. 230, 363 F.2d 717.

32. The FCC's Opposition set forth that Mr. Zinn's withdrawal did not "change the decisional premises" of the FCC decision, as contended by appellant, since the grant to Sunbeam was based on the full time participation and broadcast experience of the three stockholders who remained, and since Zinn could not join the company unless and until cleared, there was no point in a hearing. See pp. 5–6:

> Under our system of jurisprudence, Zinn is considered innocent until the contrary is proved. And, even if Zinn should ultimately be found guilty, the public interest herein has already been protected by virtue of the agreement whereby Zinn has withdrawn from the corporation, and can only reacquire his stock if he is cleared of the charges.

33. See 16 F.C.C.2d at 13–14.

34. The FCC stated:

> Thus, quantitatively, BBI is in a superior position to Charles River on the integration factor. Qualitatively, BBI is also in a better position than Charles River inasmuch as certain of the full-time participating owners of BBI would bring extensive television operating experience to the proposed station. . . . Also of significance is the regulatory experience which was acquired by Mr. David with the Federal Communications Commission. Although such experience is not to be equated with operating experience, it does provide assurance of knowledge of the framework of the Communications Act and the Commission's rules and its policies.

there was full-time participation by three others whose stock totaled more than 5%, all as compared with Charles River's limited integration of only a 4.9% non-voting stockholder.

We need not consider further whether charges against Mr. David would warrant remand if the FCC order had not become final,[35] for the FCC order did become final, and that is a fact of paramount importance.

6. *Relative dominance of interest of administrative finality, when the pertinent order of the agency has become effective and final beyond administrative recall or appeal*

The critical fact of the case before us is that the Commission issued a construction permit to BBI, following this court's mandate affirming its order.

■ The holder of a construction permit awarded by a final order—*e. g.*, an order that is never appealed—has a "high degree of protection" under the statute, as the Commission has recognized in words quoted with approval in Frontier Broadcasting Co. v. FCC, 111 U.S.App.D.C. 321, 323, 296 F.2d 443, 445 (1961).

The protection is not absolute. Thus, while 47 U.S.C. § 319(c) provides that on completion of construction the FCC shall issue a license, there is an exception where "cause or circumstances arising or first coming to the knowledge of the Commission since the granting of the permit would, in the judgment of the Commission, make the operation of such station against the public interest." This exception would permit deferral of a license pending inquiry into newly available data on overlap and interference. CBS v. FCC, 93 U.S.App.D.C. 399, 211 F.2d 644, cert. denied, *sub nom.* St. Louis Amusement Co. v. United States,

348 U.S. 876, 75 S.Ct. 112, 99 L.Ed. 689 (1954).

However, the FCC does not claim that it would have authority to deny a license to BBI if the order granting a construction permit had become final for lack of appeal and subsequently charges had been brought against Mr. David.

The finality provided by Congress is evident not only from the present text of the statute but from its history. Prior to 1952, § 405 of the Act provided that rehearing in radio matters had to be sought within 20 days—a limit on administrative flexibility to provide reconsideration that was in contrast to the provision in § 405 that in common carriers proceeding a petition for rehearing may be filed at any time.[36]

In 1952, § 405 was amended to provide a 30 day period for filing petitions for reconsideration in all cases, and this combines with the expiration of time to appeal 30 days after disposition of all petitions for rehearing. After that date the order is final and administrative recall for further consideration is prohibited.

There is a public interest in administrative finality as well as in selection of optimum applicants. Where no appeal has been taken Congress has declared the interest of administrative finality prevails over the flexibility, and possibly better choice, that might accompany a latitude for administrative recall. When the public interest in administrative finality has been made dominant for an order that becomes effective and final for lack of appeal, we fail to see on what basis this can be upset for an order that became effective and final only after the protection afforded by a court's determination that it was without legal blemish.

35. We are aware, of course, that BBI's application with a flawed Mr. David is not necessarily equivalent to an application from which Mr. David was wholly absent.

36. Under such a provision an agency has continuing jurisdiction to reconsider its order at any time on its own motion, as well as on petition, subject to the requirement of reasonable discretion under which such jurisdiction is "sparingly exercised." Sprague v. Woll, 122 F.2d 128, 130 (7th Cir.) cert. denied 314 U.S. 669, 62 S.Ct. 131, 86 L.Ed. 535 (1941).

The thrust of *Pottsville* supports this conclusion, for Justice Frankfurter warned (309 U.S. at 134, 60 S.Ct. at 443) against any approach whereby "the contingencies of judicial review and of litigation, rather than the public interest, would be decisive factors." That opinion was concerned lest the court restrict what would otherwise be the agency's area of latitude, so as to interfere with the public interest entrusted to the agency by Congress. Here the situation is reversed, for the agency is seeking to have the court expand what would otherwise be the agency's area of latitude, so as to interfere with the public interest— in administrative finality—mandated upon it by Congress.

█ Administrative finality of a construction permit does not permit administrative recall for reconsideration, or for a decision to reopen for further comparative hearing which the FCC's Request wishes to put before the FCC as a possibility, but the administrative finality is subject to certain powers conferred in the FCC by the Act for appropriate cases. Apart from the condition of § 319(c) for withholding a license, the Act contains provisions for "proceedings to modify construction permits or licenses (§ 316), for revocation proceedings (§ 313), and for investigatory proceedings (§ 403). Even the holder of a license that may not properly be revoked or modified faces the reality of the need to file an application for renewal, and to face scrutiny and comparison in that context without undue preference. Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). "Obviously the provisions for renewal

contemplate the possibility of changes in conditions after the original grant and also of errors in the original grant." Radio Station WOW v. FCC, 87 U.S.App. D.C. 226, 229, 184 F.2d 257, 260 (1950).

There is also latitude for the FCC to insert conditions protective of the public interest, see 47 U.S.C. § 319(c). Its supplementary memorandum, lodged at our request, states: "The Commission has the power to condition the grant on the separation of Mr. David from the affairs of BBI pending a determination of his status." We do not understand BBI to challenge this authority—and indeed BBI and Mr. David specifically submitted to the FCC an agreement to suspend Mr. David's relations with BBI pending a conclusion of the outstanding litigation.[37] Of course such conditions would not benefit WHDH, but they would be a protection to the public, as was recognized by the FCC and this court in the *Community* case.

### 7. Precedents

█ Our conclusion is fully supported by precedent—though precedents pertaining to other agencies are not necessarily fungible, and each case calls for analysis of the statutory system governing the agency in order to ascertain how Congress has balanced the interests of flexibility and finality.

██ We may usefully begin a discussion of precedents by reference to our recent opinion in NLRB v. Wilder Mfg. Co. Inc., 147 U.S.App.D.C. 152, 454 F.2d 995 (1971), which underscores that our mandate operates to terminate our power in the proceeding unless we intend and act to preserve our jurisdiction.[38] While

---

37. In view of this letter of August 17, 1971, in effect a consent by BBI for the FCC to act by insertion of reasonable conditions, we are not confronted with the possibility that the power to insert conditions was lost by failure to act within a month after the July 29 issuance of the modified permit.

38. This court considered its prior action when on consideration of the union's petition to review the NLRB's order dismissing a complaint against an employer,

the court remanded "for further consideration in light of [a recent Supreme Court opinion] but without limitation." On remand, the NLRB entered an order against the employer. This time the union did not seek review, and the NLRB filed in this court a petition to enforce its order. We noted that under the statutory scheme this court had jurisdiction of the union's petition to review, which may be filed where the petitioner resides or transacts business, but did not have jurisdiction of the

*Wilder* is distinguishable on several grounds (see note 38) and did not involve a request for recall of mandate, the principle of administrative finality is underscored by the requirement of a new appellate process, unless the court has retained jurisdiction for review of an agency order entered after remand.

Turning particularly to the issue of recall or revision of court mandate, we refer to International Union of Mine, Mill, etc., Workers, Local No. 15 v. Eagle-Picher Min. & Smelting Co., 325 U.S. 335, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945). The Court held that where the National Labor Relations Board sought and obtained the decree of the intermediate appellate court for enforcement of a Board order for payment of back pay the Board was not entitled to have the case remanded to it for prescription of relief deemed more appropriate to effectuate the policy of Congress—after expiration of the term, and in the absence of fraud or mistake such as would support a bill of review. The Court held that there was ample opportunity for Board modification of an order—first on its own motion, and after the court had jurisdiction, by application for remand [39]—but that this did not survive the court's entry of a final decree. See 325 U.S. at 340–341, 65 S.Ct. at 1169:

> Administrative flexibility and judicial certainty are not contradictory; there must be an end to disputes which arise between administrative bodies and those over whom they have jurisdiction.

In *Eagle-Picher* the Court distinguished American Chain & Cable Co. v. FTC, 142 F.2d 909 (4th Cir. 1944), because the pertinent statute expressly provided that the FTC may, after notice and opportunity for hearing, "reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require." 15 U.S.C. § 45(b). Compare Sprague v. Woll, *supra*, note 36.

The *Eagle-Picher* opinion comments, 325 U.S. at 342, 65 S.Ct. at 1169:

> "This statute specifically allows the Commission to modify its order after it has become final. And the court merely held that it was reasonable to suppose that Congress intended the

---

NLRB's petition for enforcement which may be filed only where the person subject to its order resides or transacts business. We recognized the "practical force" in the NLRB's contention that we were the appropriate tribunal to consider a supplemental NLRB action following our earlier action, but held that this was not available since the court's earlier order had not merely remanded the record but had remanded the entire matter, and without reservation of jurisdiction, so as "to indicate its intention to relinquish jurisdiction over the particular controversy. . . . Consequently, upon remand to the N.L.R.B. . . . this court divested itself of jurisdiction over the instant controversy, and jurisdiction passed from this court to the N.L.R.B."

That decision is not controlling here for various reasons. We were considering a particular statutory scheme for a particular agency, and agencies and statutory review provisions are not fungible. We were not considering the possibility of an application to the Second Circuit to transfer the petition to this court, cf. Eastern

Air Lines v. CAB, 122 U.S.App.D.C. 375, 354 F.2d 507 (1965). Further, and most pertinently, we were not considering an application to recall or modify the prior mandate, either to clarify its intention or in the interest of justice.

Notwithstanding these qualifications, *Wilder* does underscore the significance of an unqualified remand to the regulatory agency and that any subsequent agency order must be subject to its own independent appellate process. Where the lack of such process renders the order final, that concludes the court. These principles are important in the administration of justice, and are not to be avoided by an excess liberality in the recall or revision of prior appellate mandates.

39. The Court later held that when circumstances arise after the Board's order has been issued which may affect the propriety of enforcement, the reviewing court has discretion whether to decide the matter itself or to remand to the Board for further consideration. NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 428, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947).

Commission's power to extend to cases where its order had become final by court decree as well as to cases where the order had become final by failure to appeal."

In other words, where Congress has provided for administrative reconsideration its power extends not only to orders that become final by failure to appeal but also to orders that become final by court affirmance.[40] Likewise, where Congress has withheld administrative reconsideration of agency orders that became final for lack of appeal, there is no basis for inserting such reconsideration for an agency order that became final by virtue of a judicial affirmance, at least in the absence of unconscionable injustice, like fraud on the tribunal.

Also supporting our conclusion is CAB v. Delta Air Lines, 367 U.S. 316, 81 S. Ct. 1611, 6 L.Ed.2d 869 (1961). The Court construed the Federal Aviation Act of 1958 to provide that once a CAB's certificate of public convenience and necessity has become effective—the appellate court having sustained it on the merits—the CAB may not alter it without the formal notice and hearing required by the modifications section. The Court further held that it made no difference that the CAB purported, prior to certification, to reserve jurisdiction to make summary modifications on petitions for reconsideration.

The opinion of Chief Justice Warren charts the tension between the "two opposing policies"—"the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." 367 U.S. at 321, 81 S.Ct. at 1617. He stated that Congress had been attentive to the issue in the acts governing the various administrative agencies,

and that the statute there under consideration took account of protection of the carrier's investment in operation by a "security of route" entitling a carrier to minimum procedures before a certificated operation could be canceled. The Board's reconsideration was not barred, but was required to follow the statutory provision for modification.

While the laws governing the CAB and FCC are different in various respects, they are similar in the fundamental point that they establish a structure where at some point the agency order does become final beyond its own power to reconsider, and that investments may be made in reliance on such an order with the protections provided by Congress. In that setting the public interest in finality is dominant over the public interest in possibly improving the administrative result on further consideration. That interest in finality—subject to procedures for modification, termination, renewal, etc.—permits the making of investments like the investments made by BBI in construction which its permit not only permitted but required to be undertaken with reasonable dispatch.[41]

## 8. *Distinction from remands involving orders not yet final*

To avoid any possibility of misunderstanding, we note that nothing herein is meant to cast doubt upon the authority of a court to provide for remand to an agency—where a final administrative order has been timely appealed—with provision for reopening of the record and the scope of the agency proceeding, when deemed in the public interest. We have had occasion to order such remands in various situations, sometimes in accordance with agency views, and sometimes for a broader con-

---

40. Under the *Pottsville* approach the "judgment" rule which requires a district court to obtain advance approval of the appellate court that affirmed its order (see note 22), should not be transplanted where the order affirmed is that of an administrative agency.

41. 47 U.S.C. § 319(b) provides that a construction permit "shall provide that said permit will be automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow, unless prevented by causes not under control of the grantee."

sideration than that sought by the agency. WORZ, Inc. v. FCC, 120 U.S.App. D.C. 191, 345 F.2d 85 (1965); Minneapolis Gas Co. v. FPC, 111 U.S.App.D.C. 16, 294 F.2d 212 (1961).

Whether considerations of administrative finality would preclude the granting of an agency motion for remand, filed prior to appellate decision, for the purpose of broadening agency consideration and determination of an order without "legal blemish"—and without any allegation such as significant change in conditions, or newly-discovered evidence—is a question we have expressly reserved without decision. Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). While *Braniff* authorized the remand to embrace the broadened investigation by the agency, our decision vacating the agency order denying reconsideration as legally defective left the administrative proceeding in the posture of one pending "upon petition for reconsideration, with the effective date of the certificate stayed pending reconsideration." (126 U.S.App.D.C. at 414–415, 379 F.2d at 468–469.)

9. *Disclaimer of case of fraud or mistake ascribed to the party opposing recall*

We note and reiterate that in this case, as in *Eagle-Picher*, there is no claim by the agency seeking revision or recall of mandate that the opposing party was involved in a fraud or concealment upon the agency. In its supplementary memorandum lodged at our request the FCC stated (p. 31):

The Commission has no information indicating that BBI has compromised the integrity of either the administrative or judicial process by reason of any misrepresentation, secret influence or like matter.

Indeed the Commission affirmatively notes in its Request (as supplemented)

that BBI advised the Commission and all parties on April 2, 1971, of the filing of a suit against Mr. David by one David Freedman, alleging violation of securities laws in connection with the purchase of unregistered stock.

When there is fraud on the agency, or concealment, a serious matter is involved, as is noted in this court's 1958 opinion in an earlier phase of this Channel 5 proceeding.[42] Certainly it provides reason for expansion of remand when the order has not yet become final. Butterfield Theatres v. FCC, 99 U.S.App.D.C. 71, 237 F.2d 552 (1956). Whether and under what circumstances fraud, or concealment rising to the level of fraud, permits the setting aside of a final administrative order is a matter that need not concern us here, for no such claim is made. The question may be academic in view of the abundance of statutory authority for dealing with such a condition.[43]

## V. CONCLUSION

We must decide whether to recall our mandate to permit the FCC to consider what action should be taken in the light of the charges against Mr. David, including the possibility of reopening for comparative proceedings.

The question would be close if the issue were whether to order a remand for further proceedings concerning an order that had not yet become final, and was pending before the court on review. Remand has been provided in such cases where a "core" substantive question was involved—one going to the heart of the decisional process. In the present case the participation of Mr. David was material, and made a contribution to the FCC's decision in favor of BBI, but had lesser significance than was involved in the other cases where we ordered remand.

42. Massachusetts Bay Telecasters, Inc. v. FCC, 104 U.S.App.D.C. 226, 232, 261 F. 2d 55, 61 (1958).

43. The issue may become whether the agency may avoid the procedures and

burdens incident to the statutory procedures. Such a question may be foreglimpsed, but it should not be foreshortened by advance speculation.

It is significant, as our *Community* opinion pointed out, that the charge of Mr. David's violation of law, did not relate to BBI or to a matter within the direct cognizance of the FCC. If it had, the FCC would presumably have made prompt inquiry upon being notified by BBI in April 1971 of the charge made—at that time in a private action. *Community* further brings out as significant that the FCC can ensure observance of protective conditions whereby Mr. David will be separated from BBI's management and operation, and will have no meaningful relationship with BBI unless and until he is cleared.

What ultimately convinces us that the interest of justice would not be furthered by recalling the mandate is the finality of the FCC's order and the award of the construction permit.

If we were confronted with a request to recall or revise a mandate of affirmance in order to permit consideration by the district court of an attack upon a judgment, we should inquire whether the matter lay within that court's independent jurisdiction.

Under *Pottsville* it is our function as an appellate court—exercising both supervisory power and responsibility of restraint—to consider what lies within the agency's jurisdiction, and to avoid interference with the public interest as defined by Congress.

The Commission is not necessarily bound in future cases to adhere to the principle underlying the 1969 decision we affirmed. Indeed, it is not bound to adhere to decisions, standards or policies previously set by the agency, insofar as future procedures or regulations are concerned.[44] However, the Commission is bound to respect the governance of a final administrative decision for the particular matter there determined. Congress has given dominant weight to the public interest in repose that prohibits further administra-

tive consideration for such a final order. This public interest—uncontrovertible for an order not appealed—has equal if not greater application, in our view, for an order that has been reviewed and affirmed on court appeal as without legal defect.

Such finality is dominant but not absolute. We assume doctrines deeply rooted in equity jurisprudence permit a recall of an appellate mandate of affirmance to avoid an unconscionable injustice growing out of misconduct undercutting the integrity of the administrative or judicial process. But there is no claim of such misconduct. We see no basis for a claim of unconscionable injustice in permitting BBI's retention of the award on the protective condition of effective separation from Mr. David. The Commission's Request for recall of our mandate is denied.

So ordered.

44. City of Chicago v. FPC, 128 U.S.App. D.C. 107, 115, 385 F.2d 629, 637 (1967); Pinellas Broadcasting Co. v. FCC, 97 U.

S.App.D.C. 236, 238, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).